## Case No. 16,563.

### UNITED STATES v. TWENTY-FIVE CASES OF CLOTHS.

[Crabbe, 356.] [1]

District Court, E. D. Pennsylvania. May 4, 1840. [2]

CUSTOMS DUTIES—FORFEITURE FOR UNDERVALUATION—CONCLUSIVENESS OF COLLECTOR'S ACTION—COMPETENCY OF WITNESS—EVIDENCE—IRREGULARITIES IN SEIZURE—REPEAL OF STATUTES BY IMPLICATION—REVIVAL—CONSTRUCTION.

1. An officer of the customs who has assisted in the seizure of goods for violation of the revenue laws, is a competent witness on a suit for the forfeiture of such goods; the contingency that an action of trespass will be brought against him, by the claimants, being too remote to constitute a valid objection to his testimony.

2. The repeal of a law by implication and construction of a subsequent statute, should be so clear as to leave no reasonable doubt that such was the intention of the legislature. It should not be deduced by an ingenious course of argument, but should appear at once.

3. Where goods have been passed at a customhouse at the invoice valuation, and a suit is subsequently commenced against them, on the ground of their being fraudulently undervalued in the invoice, such undervaluation may be shown by evidence on the trial; and the United States are not bound by the action of the revenue officers in assenting to such invoice valuation.

[Quoted in 1,209 Quarter Casks and 1,235 Octaves of Sherry Wine, Case No. 14,279.]

4. The counsel for the plaintiffs in a suit for a forfeiture having notified the claimants to produce a certain invoice, the latter declined so doing until the former would say whether they would take the invoice with, or without, a letter which was written on the same sheet, and offered it to the plaintiffs in either way they chose; the plaintiffs declined making a choice without first seeing the letter, and the court ordered that the invoice should be produced, but that the letter should not be included in that order.

5. Where goods in the custody of the United States are being proceeded against by them, an irregularity in the seizure cannot avail the claimants in such suit.

6. The revenue laws of the United States are to be so construed as most effectually to accomplish the intention of the legislature in passing them; and do not fall within the rule that penal laws are to be construed strictly, in favor of those who may be prosecuted under them.

7. When a statute contains an absolute affirmative repeal of an antecedent statute, or part of it, then the expiration of the subsequent statute, by its own limitation, will not revive the repealed act.

8. The sixty-sixth section of the act of March 2, 1799 (1 Story's Laws, 631, 632 [1 Stat. 676, 677]), is in force.

9. Where, in a suit for the forfeiture of goods under the revenue laws, sufficient evidence has been given for the prosecution, to satisfy the court that there was probable cause for the proceeding, the burthen of proof is thrown upon the claimants.

[This was an information of forfeiture against 25 cases of cloths, 15 cases of cassi-

meres, 1 case of cloths and cassimeres, and 24 pieces of pilot cloths. John Taylor, Jr., and Blackburne & Co., claimants.]

The information contained 13 counts: (1) That the goods were brought from a foreign port into some port or place in the United States, to the attorney of the United States unknown, and were unladen and delivered from the vessel in which they had been brought, without any permit or special license from any collector or naval officer, or any other competent officer of the customs. (2) That the goods were brought into the port of New York, and there unladen and delivered without a permit. (3) That the goods were found concealed in a certain store, in the occupation of William Blackburne & Co., at the port of Philadelphia, the duties on said goods not having been paid or secured to be paid. (4) That the goods were entered at the port of New York, and on each entry an invoice produced and left with the collector, and that the said goods were not invoiced according to the actual cost at the place of exportation, but at less sums than such actual cost, with design to evade the duties thereupon, or some part thereof. (5) That the invoices and packages presented at New York, were made up with intent, by a false valuation, to defraud the revenue of the United States. (6) That the invoices presented at New York were made up with intent, by a false valuation, to evade and defraud the revenue of the United States. (7) That all, and each of the packages contained in the entries, and each and every of the invoices, were made up with intent, by a false valuation, to evade and defraud the revenue. (8) That all and each of the invoices were made up with intent, by a false extension, to evade and defraud the revenue. (9) That all and each of the packages were made up with intent to evade and defraud the revenue. (10) As the fourth count, with the exception of the entry being laid at some port or place, to the attorney of the United States unknown. (11) As the sixth count, with the same exception as in the tenth count. (12) As the seventh count, with the same exception as in the tenth count. (13) As the ninth count, with the same exception as in the tenth count.

The information was subsequently amended: First, by inserting in the first three counts the name of George Wolf, the collector of the port of Philadelphia, as the party seizing the goods, and second, by inserting in the last four counts, the port of New York, for the port or place unknown.

The counts were founded respectively, as follows: The first count on the 50th section of the act of March 2, 1799; the second count on the 50th section of the act of March 2, 1799; the third count on the 68th section of the act of March 2, 1799; the fourth count on the 66th section of the act of March 2, 1799; the fifth count on the 4th section of the act of May 28, 1830 [4 Stat. 410], and on the 14th section of the act of July 14, 1832 [4 Stat.

[1] [Reported by William H. Crabbe, Esq.]

[2] [Affirmed by circuit court, case unreported. Judgment of circuit court affirmed by supreme court in 3 How. (44 U. S.) 197.]

593]; the sixth count on the 4th section of the act of May 28, 1830; the seventh count on the 14th section of the act of July 14, 1832; the eighth count on the 4th section of the act of May 28, 1830; the ninth count on the 14th section of the act of July 14, 1832; the tenth count on the 66th section of the act of March 2, 1799; the eleventh count on the 4th section of the act of May 28, 1830; the twelfth count on the 14th section of the act of July 14, 1832; and the thirteenth count on the same section.

On the 10th March, 1840, John J. Logue, being sworn, on his voir dire, said: I was one of the persons who went to Mr. Blackburne's store, and assisted in making the seizure.

Whereupon Mr. Williams objected to the witness, on the ground of interest, as he might relieve himself from his liability to an action of trespass, and obtain a certificate of probable cause, by means of his own evidence.

Cadwalader and Dallas. Whether an action of trespass will be brought is a remote contingency; it is a collateral matter; the interest is not sufficiently direct. The witness is not interested in the case to the extent of a farthing. Act March 2. 1799, § 91 (1 Story's Laws, 655, 656 [1 Stat. 697]); The Thomas and Henry v. U. S. [Case No. 13,919]; McVeaugh v. Goods, 1 Dall. [1 U. S.] 62.

Mr. Sergeant replied.

Mr. Cadwalader, Mr. Dallas, and Mr. Read, for plaintiffs.

Mr. Meredith, J. Sergeant, and Mr. Williams, for claimants.

HOPKINSON, District Judge. The question is, could the verdict in this case be given in evidence either for or against the witness, in case an action of trespass be brought against him, by the claimants, for the seizure? First. Suppose the verdict should be for the claimants; then in an action by them against the witness, that verdict clearly would be no evidence for him, nor would he desire to give it in evidence; neither would it be evidence on the part of the plaintiffs in such action against the defendant. He is no party to this verdict, and has no direct interest in it; he is to gain or lose nothing by it, and the verdict, which acquits them of the alleged forfeiture of their goods, does not prove a trespass by him. That must be made out by proof of the fact that he did seize the goods in the store of the claimants. It would then be for him to show his justification. In the case of the master sued for the negligence of his servant, and the sheriff for the trespass of his deputy, the verdict against the master or the sheriff, could not be given in evidence by either of them, in a suit against the servant or deputy, to prove either the negligence or the trespass, but merely to show the damage sustained. In this case, the verdict for the claimants will simply restore their goods, and will not ascertain what damage they sustained by the seizure.

There will be nothing in the issue between the claimants and the witness for which this verdict can be given in evidence for them, and against him. They must prove the damage, as well as the trespass complained of, by original and independent testimony. But, second, suppose the verdict here should be against the claimants, and they should bring suit for the trespass against the witness—a case so improbable that it can hardly be supposed—could the defendant avail himself of this verdict, as an answer to the action? I apprehend not; for the jury who should try that issue would not be bound by the opinion and conclusions of this jury upon the evidence. Whether the act of congress would or would not acquit the officer, in such a case, I do not say. But, be that as it may, the contingency of an action of trespass, in such circumstances, is too improbable to constitute a valid objection to the witness. Objection overruled.

On the 16th March, 1840, John Siter was offered, on behalf of the plaintiffs, to prove that he had examined and appraised the goods at the instance of the government officers; and that they were undervalued in the invoices. Mr. Siter was one of four private appraisers, that is, those not appointed as official appraisers. who were called upon to examine the goods.

Mr. Meredith objected to the evidence on the ground that the goods having been appraised by the official appraisers, at New York, who had adopted the value as stated in the invoice; having passed through the custom-house on and by that appraisement, according to which the duties had been estimated and paid; and having been delivered to the owners upon the payment; no evidence could be received, on the part of the plaintiffs, to disclaim or contradict that appraisement, or to show that the goods were of a greater or different value; but that that appraisement was conclusive and final against the plaintiffs in this or any other proceeding. Tappan v. U. S. [Case No. 13,-749]; U. S. v. One Case of Hair Pencils [Id. 15,924]; U. S. v. Eighty-Four Boxes of Sugar, 7 Pet. [32 U. S.] 453; U. S. v. The Burdett, 9 Pet. [34 U. S.] 682; U. S. v. Tappan, 11 Wheat. [24 U. S.] 419.

Mr. Cadwalader, for plaintiffs.

The effect of the principle contended for by the claimants. would be to repeal and expunge a vast body of the laws of the United States. An attempt to defraud would be punishable, but if the attempt should be successful, the perpetrator and his goods would go free. Our ground is threefold: First, that the appraisement of all goods is not necessary, and did not take place in this case. Second, that an examination and appraisement is not conclusive upon the United States as to a claimant, in

a case of forfeiture. Third, that, no matter how the forms of the law may have been complied with, if there is fraud, we are entitled to go behind those forms, and to consider them as nullities, so far as the question of fraud is concerned. Wilson v. Saunders, 1 Bos. & P. 269; Blewitt v. Hill, 13 East, 13; Bosworth v. Maxwell, Hardin, 208; Reniger v. Fogossa, Plow. 10; Partridge v. Strange, Plow. 82; The Two Friends [Case No. 14,289]; U. S. v. The Union, 4 Cranch [8 U. S.] 217; Tappan v. U. S. [supra]; U. S. v. A Package of Lace [Case No. 15,985]; U. S. v. Sixteen Packages [Id. 16,303]; U. S. v. Riddle, 5 Cranch [9 U. S.] 311; U. S. v. Twenty-Eight Packages of Pins [Id. 16,561]; U. S. v. One Hundred and Twelve Casks of Sugar, 8 Pet. [33 U. S.] 277; U. S. v. Phelps, Id. 700; Ex parte Davenport. 6 Pet. [31 U. S.] 661; Locke v. U. S., 7 Cranch [11 U. S.] 339, 345; Sixty Pipes of Brandy, 10 Wheat. [23 U. S.] 421. Whatever is done in fraud of the law is done in violation of it. Lee v. Lee, 8 Pet. [33 U. S.] 44, 50; The San Pedro, 2 Wheat. [15 U. S.] 140; The William King, 2 Wheat. [15 U. S.] 148, 153; U. S. v. Hathaway [Case No. 15,326]; U. S. v. Lyman [Id. 15,647].

Mr. Williams, for claimants, cited U. S. v. Three Hundred and Fifty Chests of Tea. 12 Wheat. [25 U. S.] 490; U. S. v. A Package of Lace [supra].

Mr. Dallas, for plaintiffs.

The forfeiture attaches at the moment of committing the offence, when the entry was made on the fraudulent invoices, and no subsequent act could purge the fraud and forfeiture. except by the consent of the United States. U. S. v. Breed [Case No. 14,638]; Gelston v. Hoyt, 3 Wheat. [16 U. S.] 311, 316; U. S. v. Certain Bags of Coffee, 8 Cranch [12 U. S.] 398; U. S. v. Six Packages of Goods, 6 Wheat. [19 U. S.] 523; Tappan v. U. S. [supra].

Mr. Sergeant, for claimants, cited against the evidence, U. S. v. Fourteen Packages of Pins [Case No. 15,151]; Gelston v. Hoyt, 3 Wheat. [16 U. S.] 311; U. S. v. Breed [supra]; Tappan v. U. S. [supra]; U. S. v. One Case of Hair Pencils [supra]; U. S. v. A Package of Lace [supra].

HOPKINSON, District Judge. An invoice was produced at the custom-house of New York on the importation of the goods now in question. upon and by which an entry was made. It appears, by a writing across the face of this invoice, that it was received and adopted by the officers of the revenue, as a true invoice, showing the actual value or cost of the goods contained in it. Whether an examination and appraisement was made, or not, does not appear. The duties were estimated by that invoice, and, upon paying or securing them, the goods were delivered to the owner. A prosecution has been commenced against these goods; they have been seized, and are alleged to be forfeited on the ground, amongst others, that this was a false invoice. and did not exhibit the true and actual prices or value of the goods; a witness is now offered to testify that the goods are falsely charged in the invoice, and that they are actually worth, or actually cost, more than the prices of the invoice. It is objected. that this evidence cannot be received; that the invoice. or rather the value of the goods there set forth, having been adopted by the officers of the government, appointed for that purpose. is conclusive upon the United States, and cannot now be disclaimed or contradicted. There is written across the face of this invoice this memorandum—"Passed, case 178, woollens and cassimeres." which is considered, for the purposes of the argument. as a certificate of the appraisers, that the goods were truly valued in their opinion in and by the invoice. This memorandum being part of the same paper which was given in evidence, it was read and received, although it is not quite intelligible in what it means or by whom it is signed. In other circumstances, I presume, a certificate, however formal, could not be received without being here verified by the appraisers on oath.

Several subjects, ranging over the whole case, have been discussed in the argument, which I shall forbear to notice, because, in the view I have of the question. it is not necessary, and therefore it would be improper and premature, to give any opinion concerning them: such as the legality of the seizure; whether any appraisement has actually been made of these goods. or such an one as the law requires; whether all or any part of the sixty-sixth section of the act of 1799 has been repealed, involving the question. whether a forfeiture is incurred by a false invoice.—a question constituting a substantive charge in the libel, and not to be disposed of on an incidental question of evidence; also, whether the proceeding at the custom-house. and the delivery of the goods to the claimants, is final and conclusive in relation to the estimate of duties. The inquiry now is, whether those proceedings are final and conclusive against the United States on a seizure and prosecution of the goods on all or any of the charges laid against them in the libel; whether, if the ascertainment of the true value of these goods is necessary to support the charges that they have been fraudulently imported, entered. and passed through the custom-house at an under value, by false entries, false invoices, or other fraudulent contrivances, it is not competent for the United States to give evidence of the true value of the goods; or whether they are estopped from doing so, by the examination, appraisement, and delivery of them by the officers of the customs.

The framers of the revenue laws of the

United States have been met by two difficulties, which have given them much embarrassment and trouble. The first was to devise a mode by which the true cost or value of imported goods, which were subject to pay a duty according to their value, could be ascertained. The second was to detect and punish frauds. The objects are distinct, and the means provided to accomplish them are equally so. Various modes of examination and appraisement have, from time to time, been adopted, as experience discovered the defects of those in use. The different enactments on this subject have been traced from the first to the last by the counsel in this argument, and it is not necessary for me to retrace them, but in a very general way. It is enough to say, that they all had for their object the ascertainment of the duties that were payable on the goods. Such was obviously the intention of the fifty-second section of the act of 1799. The sixty-sixth section of the same act forfeits goods not invoiced according to their actual cost, and provides, that when the collector suspects that such is the case, he may take the goods and retain them until their value is ascertained by two respectable merchants, and until the duties are paid according to such valuation, the object being a just calculation of the duties. There is an express provision that in case of a prosecution for a forfeiture, such appraisement shall not be construed to exclude other proof upon the trial. It is clear to me that the appraisement made under this act has relation only to the duties, and not to the forfeiture. By the first section of the act of 1818 [3 Stat. 433], which is an act for the better collection of duties, the owner of goods subject to an ad valorem duty, is required to produce the original invoice to the collector. The manner of ascertaining the ad valorem duty is pointed out. The ninth section provides for the appointment of appraisers by the president, all having reference only to the estimate of the duties. By the eleventh section of this act, when the collector suspects that goods have been invoiced below their true value, he is to have them appraised in the manner described in the ninth section, and if they are found to be undervalued, an addition is laid upon them of 50 per cent., on which amount the duties are to be estimated. The twelfth section is of the same import. Every provision in this act, respecting appraisement, and the effect or evidence of such appraisement, relates to the estimation of duties, and not to a prosecution for a forfeiture.

In conformity with this view, the question raised in Tappan v. U. S. was only, whether the appraisement made under the act of 1818 is conclusive of the value of the goods, so far as respects the ascertainment of duties. The act of 1828, § 8 [4 Stat. 273], commences by declaring that the subject is the estimation of duties to be imposed upon goods imported into the United States; and, in cases of ad valorem duties, the collector is to have the actual value appraised, estimated, and ascertained, and the number of yards, parcels, and quantities, and the actual value of every one of them. The duty of the appraisers is then detailed. The whole proceeding refers to the collection and payment of duties, and the appraisement is made for no other purpose, nor is it applied to any other object. The ninth section is equally explicit on this subject, and the invoice is expressly referred to, upon which the additional charge is to be made. The act of 1830 (section 2) provides for the appointment of appraisers. Section 4 directs the collectors to cause at least one package in every invoice, and one at least in every twenty, to be opened and examined, and if not found to correspond with the invoice, or if found to be falsely charged, all the goods in the entry must be inspected. Then is the direction to have an appraisement made, which is applied only to goods subject to an ad valorem duty, and if it shall be found that the invoice was made up with intent to evade or defraud the revenue, the goods are forfeited, &c. Act 1832, § 7: In cases where the duty imposed upon goods is to be estimated by the value of the square yard, or any other quantity, and in all cases of an ad valorem duty on any goods, the collector is directed to cause the actual value to be appraised, estimated, and ascertained; and the number of such yards, parcels or quantities, and such actual value of every of them, as the case may require. The duties of the appraisers are then detailed, in order to estimate the true value, any invoice or affidavit to the contrary notwithstanding. Section 8: The appraisers are empowered to call before them, and examine upon oath, any owner, importer, or consignee, touching any material matter. Section 14: If upon opening any package, the goods shall be found not to correspond with the entry, or if the package contain any article not entered, such article shall be forfeited; or if the package be made up with intent to evade or defraud the revenue, the package shall be forfeited.

Such are the legislative enactments respecting the collection of the revenue, which have been thought to apply to the question before the court. That there is no direct positive rule by which the testimony offered should be rejected or admitted; that there is no declaration that the appraisement, if one was made in the case, or the adoption of the invoice prices by the officers of the customs, shall be conclusive of the value of the goods, against the United States, in the proceeding and trial now pending, cannot be questioned; and the inquiry is,—whether such an intention can be clearly deduced from these enactments, or any of them.

It is proper, in our inquiry into the intention of the legislature as to the effect of these ap-

praisements, to remark that, in the act of 1799, there is an express proviso, that, in case of a prosecution for a forfeiture, such appraisement shall not be construed to exclude other proof upon the trial. No distinction is here made between the United States and the claimant, but the provision is general, that the appraisement shall not exclude other evidence. There is but one other express enactment upon the force or effect of an appraisement. This is found in the eighth section of the act of 1832, giving power to the appraisers to call before them, and examine on oath, any owner, importer, &c. "And if any person so called shall fail to attend, or shall decline to answer, &c., he shall pay a fine of fifty dollars, and if he be the owner, importer, &c., the appraisement shall be final and conclusive, any act of congress to the contrary notwithstanding." So far as any inference to our purpose can be drawn from these enactments, it is, that the appraisement was not intended to shut out other evidence on a prosecution for fraud and forfeiture. In the latter act the appraisement is made conclusive, as a penalty for the neglect or contumacy of the owner. The words "any act of congress to the contrary notwithstanding," seem to imply that it was supposed that preceding acts would not have made the appraisement final and conclusive without this declaration.

There being nothing in any act of congress which declares that, in a case like the present, the appraisement shall be conclusive evidence of the cost and value of the goods, the counsel for the claimants have endeavored to support their objection by reasoning from the general character and provisions of the acts of congress, on the subject of the revenue. The argument most relied upon is that which is drawn from the act of 1832. It is argued that, inasmuch as the appraisers, by that act, may make their appraisement without any regard to the invoice, we must therefore, also, put the invoice aside on the question of value, and take the appraisement as the only evidence of it. I cannot see the force or congruity of this argument. The object of the appraisers was to estimate and ascertain the actual value or cost of the goods, and this they might well do by their own skill and knowledge, and other means of information in their power, without any reference to or reliance upon the invoice or affidavit of the owner. Our inquiry is, whether that invoice, and that oath, are true or false, honest or fraudulent; and this we cannot possibly answer, without having that invoice before us, nor without testing its truth by other evidence than itself; by any evidence by which its truth or falsehood can be made to appear. The appraisers could perform their duty and reach their object without the invoice, but we cannot do so, nor even move a step towards it. The inquiry and proof are equally open to both parties. In the cases tried in this court, the claimants have been let into all the proof they could produce, to overrule the opinion of the appraisers. Commissions have gone abroad to collect testimony for them, and the appraisers were examined and cross-examined as to the means or standards by which they made their estimates. It was the trial of an issue, fraud or no fraud, and the whole question was open to any legal evidence on the one side and the other. The broad and increased power given to the appraisers by the act of 1832, is far from being a reason why they should decide without appeal, without check or control, especially in a new proceeding before a court of law, which in fact will have nothing to try if the doctrines of the claimants are sound. With an invoice false and fraudulent on its face, with a dozen witnesses ready to prove it to be so, it will be a sufficient protection to the offender to say, here is the certificate of the appraisers, and by that the invoice proves its own truth; I have satisfied them, or I have deceived them, I need not say how, and I put the court and the law at defiance. The revenue will be dependent upon the integrity and intelligence of the appraisers; they must be too honest to be tampered with, and too intelligent to be deceived. We may have such men, but it will be hard to find them. Our inquiry has no reference to the amount of duties assessed or paid for these goods. It is nothing to this issue, whether they were too much or too little. There is no attempt to disturb or revise them. The object here is to ascertain whether a certain paper, called an invoice, which was produced at the custom-house of New York on the entry of the goods, is true or false. Suppose the duties had been calculated on a valuation made by the appraisers under the act of 1832, without regarding or looking at the invoice, would it be a less offence against the revenue for the importer to have exhibited an invoice containing a false valuation of the goods, with intent to defraud or evade the duties? Can we try or decide whether it was a false valuation, without information and proof of the true and real value? It is not essential to this offence that the invoice should be used by the appraisers in making their estimate, nor that it was one of the means by which they were deceived. To invoice the goods below their actual value and cost, and to enter them by that invoice, with design to evade the duties, is, per se, an offence which forfeits them whether the invoice was afterwards instrumental in the estimation of the duties for that purpose or not. The evidence must follow the issue and must depend upon the fact to be proved when the question is, whether, when an importer has paid the duties legally chargeable upon his goods, it may be enough for him to say, I have paid all that the officers of the government, appointed to ascertain them, declared to be due, and the question should rest. But when the inquiry is, whether he has been guilty of a specific fraud or not, it would be extraordinary if the acts or opinions of men, in reference to another subject, should be con-

clusive, either for his condemnation or acquittal.

It cannot be doubted that to enter goods with a false invoice, with intent to evade or defraud the revenue, subjects them to forfeiture; this is declared by the sixty-sixth section of the act of 1799, which for the present I consider to be in force, and one of the counts of this information is founded on that section. It is said to be repealed, but, as I have remarked, I shall not, on an incidental question of evidence, decide that question. If it be so, the claimants will have the benefit of it, after the evidence is heard. If that count be good, it must be competent to the district attorney to support it by proof of the allegations and facts contained in it. But, can it be proved as a matter of fact, that the invoice was false, that the value and prices of the goods, as therein exhibited, are false, unless, in the first place the invoice be laid before the jury that they may see what are the cost and value therein charged, and then that proof, common law proof, for the statute prescribes none, be received to show that the cost and value as given in the invoice are not true?

On the subject of the repeal of this section, which is justly considered an important inquiry, it may not be amiss to suggest, that the repeal of a law, by implication and construction of a subsequent law, should be so clear as to leave no reasonable doubt that such was the intention of the legislature; it should be as certain as an express repeal. It should not be deduced by an ingenious course of argument; but should appear at once. It can seldom be satisfactory to arrive at this conclusion by taking a phrase from one section of the subsequent act and putting it into another section, where the legislature had not put it. The general presumption is that, if a repeal was intended, it would have been expressly declared; and such is the usual practice of legislation. If the law-makers have not said so, the intention to do so must be clearly shown from what they have said. In this case the sixty-sixth section of the act of 1799 speaks of an invoice not made up according to the actual cost of the goods, with design to evade the duties, and a forfeiture is inflicted. By the eleventh section of the act of 1818 an addition of fifty per cent. is to be made to the invoice if the appraisement exceed it by twenty-five per cent., making no distinction between a fraudulent intent and an innocent error. These two laws therefore provide for different cases, and are entirely consistent. To meet this view and show that the invoice spoken of in this eleventh section, meant a fraudulent invoice, words are carried from another section of the act to the 11th section; but we do not find them there. The argument however may be a good one: but I am unwilling to adopt it on the question now before the court, although it may serve the claimants hereafter. It will then be more carefully examined.

By the fourteenth section of the act of 1832, if, on opening the package: (1) the goods shall be found not to correspond with the entry; (2) to contain any article not entered; such article is forfeited; (3) if the package be made up with intent to defraud or evade the revenue, the package is forfeited. There are counts in the information on each of these charges or offences. The last is a very broad charge: "If the package is made up with intent to defraud or evade the revenue." It is obvious that the proof of this charge can hardly be found in any single fact, or by direct evidence. It must be effected by a combination of facts and circumstances. The machinery must have several parts to accomplish the end: a false invoice may be—perhaps I may say—must be a part of that machinery; and therefore to prove this offence of making up a package to defraud the revenue, it may be essential to prove that the invoice which came with the goods, and by which they were entered at the custom-house, was false and fraudulent, as a distinct and substantive fact, tending to support the allegation, and the issue upon it. If we should admit that where the direct issue is upon the invoice, or the question was as to the estimate of duties, the appraisement agreeing with it might be paramount and conclusive evidence of its truth, it does not follow that it would be so, when the issue is whether a certain package was made up to defraud the revenue, and the invoice is brought in incidentally, as a circumstance tending to show the fraudulent intention or design with which the package was made up.

I have avoided giving any opinion on many of the topics and questions brought into the argument, because, with my view of the direct question, it was unnecessary, and would have carried me into matters hereafter to be considered, and upon which it is proper to keep myself free. Unless the objection to the evidence were clearly sustained, I should admit it, because it is incumbent on the party taking an objection to the competency of testimony to support it, and because an error in receiving it will be attended with less inconvenience, than an error in rejecting it. It may turn out, after it is heard, not to affect materially the case of the claimants, according as they shall make it out.

The objection is overruled.

On the 4th April, 1840, Mr. Cadwalader, for plaintiffs, moved for an order on the claimants to produce a certain invoice, described in a notice which had been served on the claimants' counsel; and cited, in support of his motion, Withers v. Gillespy, 7 Serg. & R. 10; Towers v. Hagner, 3 Whart. 59; Act Sept. 24, 1789, § 15 (1 Story's Laws, 59 [1 Stat. 82]); Carroll v. Peake, 1 Pet. [26 U. S.] 22, 23.

The counsel for the claimants admitted that they had the paper in their hands ready to be delivered, when the counsel for the plaintiffs would say whether they would take it with a

letter written upon the same sheet, or without the letter, and that they might have it in either way at their option.

The counsel for the plaintiffs replied, that they wanted the invoice, and that they could not say whether the letter annexed to it was within their call or not, until they saw what it was.

Ordered by THE COURT, that the counsel for the claimants produce the invoice described in the notice, but that this order does not extend to the letter annexed to the invoice.

The argument of the case, on the evidence, commenced on the 15th April, 1840, was carried on by Mr. Read, U. S. Dist. Atty., Messrs. Meredith and Sergeant, for claimants, and concluded by Mr. Dallas, for plaintiffs.

HOPKINSON, District Judge (charging jury). It is within one day of eight weeks since you were empanelled and sworn to try this cause. I have no knowledge of any trial in a court of justice of this duration. Perhaps the time that has been consumed is not more than its importance and difficulties required. On the one side, it is alleged that the object of the prosecution is not only to punish the particular fraud complained of, but to expose and break up an extensive combination, in a foreign country, whose artifices and operations are preying upon our revenue, crippling our domestic industry, and driving our honest traders out of the market. On the other side, it is certainly true that the character and property of a citizen are deeply involved in the result of the investigation. Our duty only now remains to be performed. We have had from the counsel all the assistance that learning and labor could produce. We must endeavor to use it carefully and conscientiously. In doing this you must keep in mind, that you are not examining the truth or falsehood of a single fact or allegation. You are investigating a charge of fraud of a complicated character, and such an inquiry calls for your most vigilant attention and care, that you be not deceived. It is of the essence of fraud to be secret in concerting its designs and wary in executing them, to mislead by false appearances, to put on an honest face and front, and to preserve all the regularity and forms of a lawful proceeding. But the danger of being deceived must not make you too suspicious, nor must you suffer your fears to change the true color of things. You have observed that in the course of the trial numerous questions of law, on the evidence, have been discussed and decided. One of them, particularly, was of vital importance to the case, and was argued most elaborately. You will understand that for any errors I may have committed in these decisions the disappointed party has a remedy, and also that for any errors I may fall into in my charge to you he has the same redress. It will be my duty to give you my opinion and instructions on matters of law, clearly and explicitly, not only that you may not misapprehend them, but that the parties may have the full benefit of their right of exception. As to the evidence and facts of the case, I shall no farther interfere with your rights over them, than by reminding you of such as appear to me to demand your particular attention, with such remarks as may afford you some aid in your deliberations upon them.

Before we come to the consideration of the issues presented by the pleadings, we must dispose of some preliminary objections which are asserted, on the part of the claimants, to be destructive of the whole proceeding. It is said that the seizure of these goods was irregular, unlawful, and a violation of the rights of the claimants, and that this prosecution being founded on that seizure, is vitiated by it. And how is this pretension maintained? It is contended that the affidavit on which the warrant of seizure was issued was illegal, that it does not contain charges and specifications to justify the warrant, and that the warrant is equally defective. I see no ground whatever for the objection. The whole proceeding is substantially in conformity with the directions of the act of congress. As to a particular description of the goods, that was obviously impossible, and would be so in nine cases out of ten of seizures for similar offences. So as to the place. These goods were in a room which was a part of No. 24, to which there was no access but by the door numbered on the street 24. It was truly a part of the store of the Messrs. Blackburne, and not of Mr. Worrell, who had no means of communication with it. But all this, I hold to be entirely immaterial to the issue now trying. These goods are now in the possession of the officers of the United States—and they are claimed as the property of the United States by reason of a fraud which forfeited them. The irregularity of the seizure, even if there was an irregularity, cannot avail the claimants on this trial: it is no defence for them against the charge of fraud, or the claim of property in these goods by the United States. If the officers were guilty of a trespass, they must answer for it, if the claimants shall find it expedient to bring their action for it. If they might have forcibly resisted the execution of this warrant, and had done so, then that question would have been tried in another proceeding. But here we have nothing to do with it. Let me explain this doctrine, if it can need any explanation, by a familiar case. It is suspected that stolen goods are concealed in a particular place,—a warrant is issued to search for and seize them,—a great quantity is found concealed,—the person in whose custody they are found is indicted for receiving them. Can it be allowed or believed that he might put his defence on the allegation that there was some informality in the warrant of seizure or the matter of executing it? And that therefore the indictment and all the subsequent proceedings were illegal and void? And would it not be thought strange if the accused, in

such a predicament, and to support such a defence, were to make a clamor about his liberty, and the invasion of his rights, and the sanctity of his home, by the harpies of the law? These goods are now held, not under the warrant by which they were taken, or by the seizure made by virtue of that warrant, but by process issued from this court by the authority of which they were attached, by the marshal of the court, and are now in his custody.

Another, much more important objection, is presented to our further proceeding in this prosecution, and which, were it well sustained, would have terminated this trial almost at its commencement. It is the question already mentioned, and which was so fully argued on a question of evidence, and has been again urged upon the court. I shall give my opinion now, as I did then, so that the claimants may have their exception to it, either on the ground of an improper admission of evidence, or of an error in my instructions to you. I shall speak of it now briefly, having given my reasons at large on the former occasion. It is contended that as these goods were appraised at the custom-house in New York at the invoice prices, that as they were passed through that custom-house on that appraisement, paid the duties according to that appraisement, and were thereupon delivered to the importers, they are now exempted from all further inquiry into their cost or value, not only in relation to the amount of duties legally chargeable on them, but on a prosecution for fraud in making up those invoices, and on any or every other account; that the very fraud by which it is alleged in this prosecution the passing of the goods through the custom-house was obtained, that is, the false invoices, cannot now be inquired into. I can by no means assent to this doctrine, which in my judgment would be to offer a premium for successful fraud, and punishment only to the unskilful. I adhere, on reflection, to the opinion I gave on the trial. I will add but a remark. It is said these officers are the appointed agents of the government, and that the government is bound by their acts. The answer is plain. The government does not claim any right or privilege for itself that every citizen does not possess. Suppose one of you should appoint an agent to sell your house or goods, with even more clear and full powers than those given to the appraisers by the acts of congress. Your agent makes a sale, but it is afterwards proved that he has been grossly defrauded by the purchaser, by false representations, by the suppression of the truth, by that which constitutes fraud in the law. Would you suppose you are bound by such a transaction; that the cheat is safe and may retain your property only by saying that it was delivered to him by your agent?.

It has been insisted on the part of the claimants, that our revenue laws, at least those we have been considering, are penal laws, highly penal, and therefore are to receive a strict construction in favor of those who may be prosecuted under them. It does not appear to me that this point is of much importance in the present case, but I have been asked for an opinion upon it. It must not be understood that every law which imposes a penalty, is therefore, legally speaking, a penal law, that is, a law which is to be construed with great strictness in favor of the defendant. Laws enacted for the prevention of fraud, for the suppression of a public wrong, or to effect a public good, are not in the strict sense penal acts, although they may inflict a penalty for violating them. It is in this light I view the revenue laws, and I would construe them so as most effectually to accomplish the intention of the legislature in passing them.

These secondary matters being disposed of, we come to the examination of the matters in issue between the United States and the claimants. They are distinctly set forth in the pleadings. The information, or libel, states the causes for which a forfeiture of these goods is claimed, and the claims and answers set out the defense on the part of the claimants. To these documents your attention will be directed, for it is in them you will find the allegations on which you are to pass by your verdict.

The information contains thirteen counts, as they are called, but in fact many of them are but a repetition of the same charge presented in a different form, so as to meet the evidence as it might come out on the trial. I will briefly recur to them.

The first and second counts of the information charge that the goods were brought into some port of the United States, and were there unladen and delivered without a permit. The first states that the port is unknown, the second, that it was the port of New York. These accounts are not supported by the evidence. It appears that the goods were landed and delivered from the vessel in which they were imported, under a custom-house order, and by the custom-house officers, and were afterwards delivered not from the vessel, but from the stores, to the claimant, on what are called land permits.

The third count charges that the goods were found concealed, the duties thereon not having been paid. This count is founded on the sixty-eighth section of the law of 1799, which gives authority to every collector, naval officer, &c., if they have cause to suspect a concealment of goods, &c., subject to duty, in any particular dwelling-house, store, &c., having obtained a warrant from a justice of the peace, to enter such house, store, &c., and there to search for such goods, "and if any shall be found to seize and secure the same for trial, and all such goods, wares, &c., on which the duties shall not have been paid or secured to be paid, shall be forfeited."

Two questions are to be considered under this law: (1) Were the goods concealed in the

place where they were found? This is a matter of fact which you will decide on a careful review of the evidence. It appears that the claimant, Mr. Blackburne, rented a store in Church alley, No. 24, in this city. That the adjoining store, No. 26, was rented by Mr. Worrell, and that the lower, or ground story, was occupied by him. The second story or floor of this store, which extended over the whole building, was in the occupancy of Mr. Blackburne, and the access to it was by a large opening or doorway from Mr. Blackburne's second story into it. This doorway was usually kept open, and was so in July and August last, and up to the 20th of August, on the day when the seizure was made. On the morning of that day the porter of Mr. Blackburne saw in a newspaper, or was informed by somebody, that a seizure had been made of Mr. Broadbent's goods. Whether the Messrs. Blackburne had the same information or not is not in direct evidence, but you will judge from all the circumstances whether they knew it or not. On the same morning, the hour is not precisely fixed, but at about eight or nine o'clock, this doorway or passage is completely blocked up and concealed by boxes, &c., so that persons going into Mr. Blackburne's second story, saw nothing by which they could discover or suppose there was any communication between the two rooms. The officers on their first visit did not discover it, and went away; but on getting further information, they returned, and by introducing a stick between the boxes, they found where the passage was, removed the obstructions which concealed it, and went into the adjoining room. It was entirely dark, although Mr. Blackburne's porter says he had opened one of the windows that morning. In this room the goods in question were found, some in their cases, some lying on them. This is the evidence of a designed concealment, from the situation in which the goods were found. Are these circumstances of suspicion explained or confirmed by the conduct of Mr. Blackburne? When the officers came to his store he was there. They told him their business; he said they might search. He said he had no goods in his possession but what were imported through the port of Philadelphia. The officers examined the cloths and cassimeres in the lower story, and then went up stairs of store No. 24. After looking at some cloths and cassimeres there, one of them asked Mr. Blackburne, if they were all the cloths in his possession. He answered, "Yes, you have seen all." He was asked if he had no other store in the neighborhood. He answered, "No, you have seen all that we have." The officers did not, on this visit, discover the passage into the next store; they returned in the afternoon. One of them said to Mr. C. Blackburne, that they wished to see the second story over Mr. Worrell's store. He replied, "You have seen all the rooms that we have." The officers went up stairs and searched for the entrance into the next room. He denied that there was any access to that room. They proceeded in their search to discover one, and at last he said, "The entrance is behind those boxes." The officers were then thrusting a stick between the boxes. In the next room the goods were found, and Mr. Blackburne said he was the owner of them. In this short conversation, we have five absolute, undoubted false assertions. No equivocation, no evasion of the questions, but clear and explicit denials of the truth. Counsel say he had a right to refuse to answer, but did he? (2) Such is the question of fact on this part of the case. Such the evidence from which you are to decide whether these goods were concealed or not, in the ordinary acceptance or meaning of the word, and it is in relation to that question I am now adverting to this evidence. What bearing it may have on another part of the case, will be seen.

There is another question on this part of the case, which is partly a question of fact and partly of law. It is not enough that the goods were concealed. They might be so for an object and purpose with which neither the United States nor their revenue laws have anything to do; in which they have no concern. To make this concealment the ground of a forfeiture, the goods, first, must be subject to duty; of this there is no question in this case; second, the duties must not have been paid or secured to be paid. The concealment, therefore, spoken of in the act of congress, must have had relation to these objects. In U. S. v. Three Hundred and Fifty Chests of Tea, 12 Wheat. [25 U. S.] 493, Judge Washington, delivering the opinion of the supreme court, says: "The term 'concealed,' used in this section, is one of plain interpretation, and obviously applies to articles intended to be secreted and withdrawn from public view, on account of their being so subject to duties, or from some fraudulent motive." It has been contended for the claimants, that the concealment relates only to smuggled goods. I do not think so; it relates to any goods subject to duties, and on which the duties have not been paid.

This natural and satisfactory interpretation of the law, brings us to another question, or the meaning of the act, which is a question of law. Were the duties on these goods paid in the meaning of the words in this section? They had been passed at the custom-house of New York, and the duties there assessed upon them had been paid. Does this satisfy the provision of this sixty-eighth section of the act of 1799? In my view of this question, it brings us to the main subject of inquiry in the case, that is, were these goods invoiced at their fair and true cost and value? For the duties were paid according to the value and prices in the invoice. If those prices were the real cost of the goods, then the whole duties due upon them have been paid, and the concealment was not such an

one as is described in the act. But it is contended, that as to the amount of duties payable on these goods, the assessment made at the custom-house is conclusive, and that therefore the concealment of these goods can have no connexion with the duties. In my opinion this proposition is too broad, and cannot be maintained by the true construction of the act. Without deciding what our case does not call upon me to decide, that is, whether the appraisement made at the custom-house is conclusive upon the question of duties, so as to bar any action for an additional amount if that appraisement should afterwards be found to be too low, and where the error was one of the appraisers', without the use of any contrivance, fraud, or deception by which they were misled on the part of the owner of the goods, I am of opinion that an appraisement procured by such fraud and contrivances will be no protection to him by whom they were perpetrated. It is a universal maxim of law, of equity, of morals, that no man shall be permitted to gain an advantage by his own fraud. When, therefore, the sixty-eighth section of the act of 1799 declares that "all such goods, wares, and merchandise, on which the duties shall not have been paid or secured to be paid, shall be forfeited," it means the duties which were justly and legally chargeable upon the goods, and not a part of them, and that if the owner of the goods has obtained possession of them or passed them through the custom-house by paying a less amount of duties than was justly chargeable upon them, and has obtained this advantage by any fraud or contrivance upon the officers of the government, it will not avail him; and that if his goods are found to be concealed within the meaning of the act, he cannot avoid the forfeiture by alleging and showing that he had paid the duties required of him at the custom-house. You will further observe that the supreme court, in the case I have cited, have decided that the concealment spoken of in the act applies to articles intended to be secreted or withdrawn from public view, on account of their being so subject to duties, "or from some fraudulent motive." I understand these general words, "or from some fraudulent motive," to be restricted to a fraudulent motive connected with the duties or revenue laws of the United States. If, then, you shall believe that these goods were concealed, and that they were concealed on account of their being subject to duties, or from some fraudulent motive, such as I have described, they are forfeited by the provision of the sixty-eighth section of the act of 1799.

The fourth and tenth counts of the information bring up the question whether the sixty-sixth section of the act of 1799 has been repealed. This repeal has been contended for on the part of the claimants by virtue of several subsequent acts of congress. The part of the sixty-sixth section important to our present inquiry, enacts, "that if any goods, wares, or merchandise, of which entry shall have been made in the office of a collector, shall not be invoiced according to the actual cost thereof at the place of exportation, with design to evade the duties thereupon, or any part thereof, all such goods, wares, or merchandise, or the value thereof, to be recovered of the person making the entry, shall be forfeited." Before we look to the subsequent acts by which it is contended that the above provision is annulled, it is proper to remark that no express or declared repeal is to be found in any of them; it is inferred, or implied from certain provisions or enactments in the subsequent laws, from which it is argued that the section in question has been repealed. I had occasion to remark, in an opinion given in the course of this trial, "that the repeal of a law, by implication and construction of a subsequent law, should be so clear as to leave no reasonable doubt that such was the intention of the legislature; it should be as certain as an express repeal. It should not be deduced by an ingenious course of argument, but should appear at once. The general presumption is, that, if a repeal was intended, it would have been expressly declared, and such is the usual practice of legislation." In the laws that have been occasionally referred to in the argument of this case, it has been seen how frequently repeals of sections and parts of sections have been declared.

It is not necessary in the duty I am now discharging, to detain you with a minute examination of all the acts of congress, from which the repeal of the sixty-sixth section of the act of 1799 has been inferred. As to the law of 1818, of 1823 [3 Stat. 729], and 1828, they appear clearly to me, to provide for cases entirely different from those described in that section, which relates to goods invoiced below their actual cost, with design to evade the duties thereupon. None of the acts just mentioned provided for any such case. With this understanding of these acts, it is unnecessary for me to inquire whether the expiration of the act of 1818, by its own limitation, would revive the sixty-sixth section of the act of 1799, if it were admitted to have been supplied by the law of 1818. On this subject I would suggest, that when a statute contains an absolute affirmative repeal of an antecedent statute, or a part of it, then, the expiration of the subsequent statute, by its own limitation, would not revive the repealed act; but where there is no such express repeal, but the first statute is taken to be repealed by the implication that it is supplied by the subsequent law, then it would seem that we might well consider that the second law was rather a suspension than a repeal of the first; and if the legislature, after the experiment, allowed the second act to expire, it was their intention to go back to the provisions of the first. Otherwise, there would be no legislation on the subject. The difficulty of this question arises on the fourth section of the

act of 1830. This section, after directing the collector to have a certain number of packages opened and examined, and in what cases he shall order all the goods contained in the entry to be inspected, proceeds, "and if such goods be subject to an ad valorem duty, the same shall be appraised, and if any package shall be found to contain any article not described in the invoice, or if such package or invoice be made up with intent, by a false valuation or extension, or otherwise, to evade or defraud the revenue, the same shall be forfeited." This seems on a superficial view to provide for a case very similar to that described in the sixty-sixth section of the act of 1799. That enacts that if any goods, &c., shall not be invoiced according to the actual cost thereof, with design to evade the duties thereupon, then, that if the invoice be made up with intent, by a false valuation or extension, or otherwise, to evade or defraud the revenue, a forfeiture shall follow. Before we examine and compare more closely these two enactments, we should remark, that immediately following that in the act of 1830, there is an express repeal of the fifteenth section of the act of 1823, and also of certain parts of other acts of congress, but not an intimation of any intention to repeal or affect the sixty-sixth section of the law of 1799. We must examine this question under the restriction, that repeals of laws by implication, by construction, by conjecture, however plausible, are not to be favored. The law has given a strict rule by which we are to measure and try the case. I shall take it, for it appears to me to be truly stated, from the opinion of Judge Thompson, in the case of U. S. v. One Case of Hair Pencils [Case No. 15,924]: "It is admitted, that a repeal, by implication, of a former by a latter statute, is not to be favored. But such effect and operation is indispensable in some cases. As when the subsequent statute is inconsistent with the former, and the two cannot be reconciled. So, where the latter is on the same matter with the former, and introduces some new qualifications or modifications, the former must necessarily be repealed; the two cannot stand together. And in most cases the question resolves itself into the inquiry, What was the intention of the legislature? Did it mean to repeal or take away the former law, or was the new statute intended as merely cumulative? Affirmatives in statutes that introduce new laws, imply a negative of all that is not in the purview, so that a law directing a thing to be done in a certain manner, implies, that it shall not be done in any other manner." The judge has given us the true rule by which we must be governed in deciding whether a clear affirmative statute has been repealed by implication, by supposing a repeal where none has been declared by the legislature: Such a repeal has been insisted upon in this case, by virtue of the enactments in the acts of 1818 and 1823. In an opinion delivered on a

question of evidence in the course of this trial, I had occasion to look to this argument, for the presumed repeal was elaborately argued on that question. I adhere to the opinion then delivered, that there is no repeal to be drawn from those statutes, of the provision in the sixty-sixth section of the act of 1799, declaring that if any goods, wares, &c., "shall not be invoiced according to the actual cost thereof at the place of exportation, with design to evade the duties thereupon, or any part thereof, all such goods, &c., or the value thereof, to be recovered of the persons making entry, shall be forfeited." Here are two strong defences provided by congress to protect the revenue from the depredations of fraud and perjury. I am now asked to remove them by an implication, by an argumentative construction, by assuming that congress have intended to do what they have not declared; that they have surrendered or abandoned them. That for the forfeiture they have substituted an increase of duty, and for the right of recovery against the offender, in case the goods. are put out of their power, nothing. Surely there was nothing in the experience of the government to induce them to weaken their defences against fraud; on the contrary, their efforts have been to strengthen themselves, to meet and defeat, by their laws, the strategems and devices from time to time invented by those whose interest it was to evade them. The statutes do not relate to the same matter; they describe and provide for dissimilar cases; the first for a false invoice with a design to evade the duties, that is, with a fraudulent intention, the other for an undervaluation of the goods without any such design. It is obviously just and reasonable, that the penalty in the former case should be an entire forfeiture of the goods, but that the error in the latter should be repaired by imposing an additional duty upon them. This act, then, of 1818, and all the provisions in it for appraisement. have for their object the ascertainment of duties, while the law of 1799 inflicts forfeiture for a designed fraud, consummated by a wilful perjury. Can I say that the act of 1799 was supplied by that of 1818, or that it is inconsistent with it; that they cannot stand together, and one or the other must fall? Is the first swallowed up, in the language of the counsel, by the latter? I cannot believe in any such view. I believe that the two acts were intended to provide for different cases, that they are entirely consistent, and that it would be a bold stretch of my judicial power, to imply or presume that congress intended to repeal one by the other. In truth, the repeal would be by the court, and not by the legislature.

The doctrine contended for by the claimants, and founded on the repeal of the act of 1799 is, that there is no longer any forfeiture for entering goods by a false and fraudulent invoice, designed to evade the

revenue, and that, by the subsequent laws, the fraud must be discovered in the custom-house, on the examination and appraisement of the goods, and the seizure made before the goods leave the custom-house. The practical result of this doctrine is, that goods may be invoiced and entered at a false valuation, with the undoubted design to defraud the revenue, and nevertheless, if the fraud is so well contrived, so artfully concealed, or so well managed in the custom-house, that the owner can get his goods over the threshold, they are safe from pursuit and forfeiture, and the fraudulent owner cannot be called upon for their value. I do not see where this doctrine stops, nor why it does not extend to cases where the goods were fraudulently withdrawn from the stores of the custom-house, nor do I see how the additional duties directed under the act of 1818, are to be assessed upon them or recovered. This doctrine is too strong for me to take upon myself. When congress shall say that such is their intention, I will obey their command, but I will not take upon myself to presume or imply such an intention, on conjectural arguments and ingenious constructions. The system adopted by congress, so far as concerns our inquiries, appears to me to be this. (1) By the act of 1799, if an invoice contains goods that are undervalued, with design to evade the duties, the goods so undervalued are forfeited. (2) When this undervaluation shall exceed a certain amount, the consequence to the importer was, that he should pay an additional amount of duties according to the circumstances of the case, although there may have been no design to defraud the revenue. This was by the act of 1818. (3) Where a package or invoice has been made up with intention to defraud, the package or invoice so made up is forfeited. This is under the act of 1830. I cannot say that I have any doubt or difficulty in deciding that there is nothing in any act of congress antecedent to that of 1830, from or by which I could imply or suspect that congress intended to repeal the part of the sixty-sixth section of the law of 1799 to which I have referred; much less is there that clear, distinct, and irresistible evidence of such intention, which would justify a court sitting to administer and not to make the law, in pronouncing that such was the intention. My difficulty, and I have had some, has been with the act of 1830, and that demands a particular examination. Are the provisions of that act repugnant to or inconsistent with the sixty-sixth section of the act of 1799, or is that section fully supplied or swallowed by the enactments of the law of 1830? The fourth section of this act is that which is most relied on, and certainly has the strongest bearing on the question. By this section, the collectors are directed to have a certain number of packages out of every invoice opened and examined, to be designated by the collector. If on this examination it shall be found: (1) That the packages opened do not correspond with the invoice, by which I understand, do not correspond in the description of the goods, their quality, quantity, &c.; (2) or that the goods are falsely charged in such invoice, clearly referring to their price, value, cost, then all the goods in the entry are to be inspected. After this inspection, if it shall appear to the collector that the goods are falsely charged in the invoice, that is, are charged at false prices, at prices below their actual value or cost, as the case may be, if the goods are subject to an ad valorem duty, they are to be appraised, in order to ascertain their true value, and (1) if any package shall be found to contain an article not described in the invoice, or (2) if such package, or (3) if such invoice be made up with intent, by a false valuation, extension, or otherwise, to evade or defraud the revenue, the same shall be forfeited. What "same" shall be forfeited? It is clear to me that it refers to each and all of the cases before stated, that is, the same package which shall be found to contain an article not described in the invoice, the same package which shall be made up with intent to defraud, and the same invoice which shall be made up with such intent. If the package be so made up by containing goods of a different quality, quantity, &c., with those described in the invoice, they are forfeited; or if the invoice be made up, by a false valuation, to defraud, in either case, the forfeiture of the package in the one case and of the invoice in the other, is inflicted. A verbal criticism has been made on this clause, that is, that an invoice cannot be forfeited. I have no difficulty in understanding this to mean the goods contained in the invoice, and because, by the very force of the criticism, the language can have no meaning at all if it has not this. The thing containing, is often spoken of for the thing contained in it. If, as has been contended for the claimants, the words "if the package be found not to correspond with the invoice," embrace price or value as well as quantity, quality, &c., then the subsequent words, "or to be falsely charged in the invoice," are mere surplusage, have no meaning or effect whatever, and must be overlooked or expunged, contrary to a sound rule in the construction of statutes, indeed of every written instrument. What change has the act of 1832 made in the provisions of this section of the act of 1830? It has been seen that, by this section, if an article was found in a package not described in the invoice, the whole package was forfeited; by the act of 1832 this penalty is moderated to a forfeiture of the article not entered, and as the entry must conform to the invoice, it is the same as if it were said not contained in the invoice. So the forfeiture is continued where the package has been made up to defraud the revenue, so far as respects the package; then as to the invoice, so much of the said fourth section of the act of 1830 as prescribes a forfeiture of

goods found not to correspond with the invoice, which I have understood to mean not to correspond in quality or quantity, is repealed, but there is no repeal of that part of the section which relates to goods "falsely charged in the invoice, or to an invoice made up with intent to defraud."

With this view of the act of 1830, we must inquire whether its provisions are inconsistent with or repugnant to the enactment in the sixty-sixth section of the act of 1799, now in question. Are they so irreconcilable that they cannot stand together, that they cannot be both in force? Is this so clear and demonstrable as to force upon us the conclusion that congress, in enacting the last, must necessarily have intended to abrogate the first? The act of 1799 speaks of the actual cost of the goods, that of 1830 of a valuation to be made by an appraisement. Do they mean the same thing? The one refers to a standard of value known to the party, and infallible, the second to a standard of opinion, and which may be mistaken. The case cited of U. S. v. Tappan, 11 Wheat. [24 U. S.] 419, 427, decides strictly no more than that the words "true value." in the eleventh section of the act of 1818, import the same thing as actual cost, and other cases have been cited to the same purpose in the construction of the acts there under consideration; but it is not to be inferred from these decisions, that in all cases or in every act of congress they are always used in the same sense. The inquiry always is with respect to the basis on which, in the particular case, the ad valorem rate of duties is to be estimated; whether upon the actual cost or the current market value thereof; the act then in question is examined. and it is concluded that the word "value" cannot be understood in any other sense than the words "actual cost," in the act then under consideration (pp. 420, 421). Their natural meaning would not seem to be the same; the one would ordinarily be applied to the goods purchased, the other to goods sent by the manufacturers, or procured in some other way than by purchase. This distinction is recognised in the fifth section of the act of 1823. It directs, that ad valorem duties shall be estimated by adding "to the actual cost of the same, if the same shall have been actually purchased, or to the actual value, if the same shall have been procured otherwise than by purchase."

This inquiry goes as well to the question whether the act of 1830 embraces the same case with that of 1799, and therefore supplies it, as to the question whether they are inconsistent. If they do not relate to the same subject-matter. then the act of 1830 is neither a substitute for, nor inconsistent with that of 1799. I leave this part of the argument with these observations. and go on to the inquiry whether in any other respects these acts are inconsistent, so that both cannot be executed. How are they inconsistent? Why may they not stand together? They appear to provide for different offences. and to inflict different

penalties, and that both may be executed, both may stand and be applied to the cases as they fall under them. The act of 1799, declares that if goods shall not be invoiced according to their actual cost, with design to evade the duties, all such goods shall be forfeited. The offence is having goods in an invoice put down not according to their actual cost; the penalty is a forfeiture of the goods; and there is nothing in this act from which it can be inferred, as has been done in relation to the subsequent acts, that the fraud of the invoice must be discovered before the goods leave the custom-house, or that they must be there seized. If they have been falsely and fraudulently invoiced, the forfeiture attaches to them when the fraud is committed. and they may be taken and forfeited for it anywhere and at any time. But the offence designated in the law of 1830, is entirely a different one, and the penalty is different, and neither of them inconsistent with the act of 1799. I shall speak only of the invoice. By the act of 1830, there is no provision for the forfeiture of individual goods which are falsely charged in an invoice, but the provision is, if the invoice be made up with intent to defraud, then the invoice is forfeited. The offence is the making up, the preparing and entering on an invoice with design to defraud, and this deliberate concoction of such an attempt upon our revenue and its laws, infects and forfeits the whole invoice, although it may contain goods properly charged. Is there not reason for this? When goods are found, perhaps but one or two articles in a large invoice, it would be harsh to forfeit the whole on that account, although these individual articles may have been introduced into the invoice with a fraudulent design. all the rest having been honestly invoiced without any intention to defraud. It was therefore thought sufficient to guard against such a practice, to forfeit the offending articles. But when the whole invoice was fabricated. prepared, made up with a design, traced back to its formation. it was manifestly right and just to visit the deliberate contriver of the scheme with a forfeiture of all the goods contained in the invoice. without any discrimination in favor of such as may have been invoiced at a proper price, perhaps to assist in deceiving the officers and defrauding the law. In this particular these acts appear to me to be consistent, to provide for different cases, to direct different proceedings. and to impose different penalties. The latter is therefore no substitute for the former. On a different construction there would be no penalty or no forfeiture of goods for invoicing them at false prices, unless you could go on and show that the whole invoice was made up with that design. No penalty but such an increase of duty as is imposed upon the most innocent error in charging the goods.

But there is another important particular in which the sixty-sixth section of the act of 1799 is neither supplied by nor inconsistent

with any of the subsequent acts. I have already adverted to it. I mean that provision which gives to the United States a right of recovery of the value of goods which have not been invoiced according to their actual cost, with a fraudulent design. This proceeding was intended to be applied to a case where the goods could not be reached by a seizure and forfeiture, but have been got through the custom-house, had been removed from its stores, and so disposed of as to be out of the power of the United States. This is obviously a most important and effective instrument in the hands of the government. It teaches the offender that however he may succeed in deceiving or in corrupting the officer of the custom-house, however he may succeed in putting his goods where the law cannot reach them, he will not be safe in the perpetration of his crime, but will be personally answerable for the goods which were forfeited to the United States and became their property by the fraud. Has congress in any manner, express or implied, abandoned this most valuable guard over their custom-houses and their revenue? If they have not, have I a right to do it for them by a judicial construction of acts that have no reference to it in any way? If this enactment is to be taken away, it must be done by the authority that made it. It is not for a court, bound to execute the law, to construe away by remote implications and argumentative constructions, such a salutary provision as this. I will add another observation upon this part of the case. The counsel for the claimants have contended, it is not necessary for me now to say with what success, that by the provisions of the act of 1830 and the subsequent acts, the whole proceeding, as respects the goods, must take place in the custom-house, the examination and appraisement must be there, the fraud must be there discovered, and the seizure there made. What is the effect of this argument upon the question of the repeal of the sixty-sixth section of the act of 1799? If the argument be sound, and the claimants must stand by it, or they will escape the act of 1799 only to fall under that of 1830, if the argument be sound, and the sixty-sixth section of the act of 1799 is repealed, then it follows that the fraudulent owner of goods passed through the custom-house by a false invoice and a false oath may, an hour afterwards, exhibit them and hold them in open day safe from all danger, intangible by the law and the officers of the law, and furthermore, be not personally responsible for the value of the goods he has thus taken from the United States, and which in truth and fact were the property of the United States. Could congress have intended this? This would be to lay the revenue bare to the hand of the spoiler, and to say to him, Do your business adroitly, avoid immediate detection, and you may do it with impunity! Every citizen may follow and take his goods fraudulently taken out of his possession: but this just and necessary right is denied only to the United States. Can this be so? The right and property, whatever they were, which the United States had in these goods, could not be divested by a fraud.

I have now disposed of the most important questions of law which have been raised and discussed in the course of this trial. My decisions may be erroneous, and if they be so there is a means for correcting them. I have given to them a close and anxious attention, both on the argument here, and in my researches in my library. I have not therefore fallen into error from inattention or an indisposition to labor. I have given the result of my researches and reflections, and it is my highest satisfaction to know that another tribunal may be resorted to, to review my opinion.

We now approach the evidence and facts of the case. But here a preliminary question of law meets us, which must be considered before we enter upon the evidence and facts. I allude to the question so strongly contested at the bar. On which party does the law throw the burden of proof: or the onus probandi? Are the United States bound to prove the charge of fraud affirmatively, to your full conviction, or have they done enough to make it incumbent on the claimants to prove their innocence? The answer to this question is not submitted to your discretion or to mine, but is given by an act of congress which has been forty years in force, and the justice and policy of which have not been denied. By the seventy-first section of the act of 1799, it is declared that, "In actions, suits, or informations, to be brought where any seizure shall be made pursuant to this act, if the property be claimed by any person, in every such case the onus probandi shall lie upon such claimant;" at the conclusion of the section, separated from this clause by other matter, it is added, "but the onus probandi shall lie on the claimant only where probable cause is shown for such prosecution, to be judged of by the court before whom the prosecution is had." When must this probable cause exist? When must it appear and be known? It is contended on behalf of the claimants that it must be antecedent to the seizure, must have been known to those by whom the seizure was made, and be the ground and warrant for their proceedings. I can by no means assent to this construction of the law. It has no reference whatever to the seizure but to the trial; there must be probable cause for the prosecution, not for the seizure; and the court is to judge of it, by what appears to the court, by what comes to the knowledge of the court on the trial of the prosecution. If, then, the evidence adduced on the part of the prosecution shall in the judgment of the court show a probable cause for the prosecution, the law says, the burden of proof shall be thrown upon the claimant, that is, he must discharge himself from the prosecution, he must prove his innocence, that he has not committed the offences charged upon him, to the satisfaction

of the jury, or he must stand condemned. At first blush this would seem to be unreasonable and unjust. If it were so we are bound to obey and execute the law; we have no power as a court, as jurors, or as citizens, to disregard it. We shall see presently, I think, that it is neither unjust nor unreasonable.

On the close of the evidence on behalf of the prosecution, how did the case stand before the court? (1) I refer generally to the circumstances attending the seizure; to the attempts to conceal the goods that the officers of the law were in search of; to the repeated, deliberate, and confessed untruths declared to the officers by the claimants, to divert their pursuit and prevent the discovery of the goods. which were hidden with great skill. It has been said again and again by the counsel for the claimants, that they were not bound to answer the questions of the officers; that they might lawfully refuse to answer them. Let this be granted; but can it be denied that if they did answer they were bound to answer truly? They showed no reluctance to answer: they did so, promptly and freely, but falsely. Does this raise no presumption against their innocence? Is it not a strong ingredient in the probable cause required by the act of congress? As to the panic, caused by the suddenness of the attack, you will judge of that. I see no evidence of it. They had taken the alarm before the officers came there; they had time to deliberate and determine the course they would take, and they did determine to get clear of the difficulty and suspicion they labored under, not by the open, candid proceeding of men conscious of innocence and fearing no investigation, but, to protect themselves, to escape from it by a concealment of the property sought after. and by a tissue of falsehood to prevent a discovery. This began in the morning and was continued in the afternoon. Where was the sudden surprise by which this conduct is now excused? (2) A second ground of probable cause shown by the evidence of the prosecution, is found in the testimony of the appraisers, public and private. We are not on this question to consider the effect of the claimants' evidence to diminish the force of that testimony. On the testimony of these appraisers a very important undervaluation of the goods appears, and may be considered by you a probable cause at least for the prosecution. But there is a sort of negative testimony on this question of the onus probandi, which must have a powerful influence on the judgment of every man. It is, that the claimants have made no attempt, no pretence to meet the direct question in issue, that is, what was the actual cost of these goods, although it is undeniably in their power. And it is now that you will perceive that in a case of this sort, there is nothing unjust or unreasonable in throwing the burden of proof upon them, in calling on them to prove their innocence, after the United

States have shown probable cause for the prosecution. We have on this point, the opinion of as great a judge and as just a man as ever sat upon the bench to administer the laws of his country. In The Thomas and Henry v. U. S. [Case No. 13.919], an opinion is delivered on this seventy-first section of the act of 1799. The chief justice says: "In this case, the United States are not required to establish guilt, but the claimants must prove their innocence. It is not the duty of the judge to justify the legislature, but surely, if, in any case such a legislative provision be proper, it is in this. The fact is generally premeditated, and is perpetrated under all the precautions and in all the secrecy which ingenuity can suggest, and the means of proving innocence, at least, to a reasonable extent, which is all that can be required, are in possession of the accused. In such a case he may, without a violation of principle, be required to prove his innocence. In such a case, the absence of testimony clearly in the power of the claimant, if not supplied by other equivalent testimony, must be fatal." The same doctrine is maintained by Judges Washington and Story, and by the supreme court of the United States. Indeed it has never been questioned, and that it is just and reasonable is manifest to common sense. U. S. v. The Hunter [Case No. 15,428]; U. S. v. Hayward [Id. 15.336]; [The Luminary] 8 Wheat. [21 U. S.] 407.

Apply these principles, so obviously just and reasonable, to this case. The question is, what did these goods cost in England? The claimants are the importers and purchasers. They know to a cent what they cost, they know of whom they purchased them, and they know precisely where to go for the proof, if they have it not in their pockets. But they have made no such attempt, nor have they given any reason for the omission. What says the chief justice to such a case? That "the absence of testimony clearly in the power of the claimants, if not supplied by other equivalent testimony, must be fatal." The only attempt at a reason for the absence of this conclusive evidence, clearly in the power of the claimants, was made by one of the counsel. It was this, that the seizure was made for non-payment of duties, and gave them no notice that the cost of the goods would come in question. It was forgotten that the information was filed in September, which sets out precisely the grounds on which the forfeiture would be insisted on, and among the rest, that the goods were not invoiced at their actual cost. On this question of the burden of proof, I am clearly of opinion that the United States have shown probable cause for the prosecution, and that the onus probandi is thereby thrown upon the claimants.

The important questions you have to decide in this case are. whether the goods in question, or any, and which of them, were invoiced below their actual cost, and wheth-

er the invoices, or any, and which of them, or the packages, or any, and which of them, were made up with the design, to evade the duties legally charged upon them, and to defraud the revenue of the United States. In pursuing this inquiry, you will always bear in mind the principle just decided, to wit, that the burden of proof lies on the claimants; that it is incumbent on them to prove to your satisfaction that the goods are invoiced at their actual cost. If they have not done so, their defence must fail. The first step in this inquiry is to ascertain what was the actual cost of these goods; and how has this been done on the part of the United States? By certain appraisements made in the first place by official appraisers of the custom-house of this city, and further by certain private appraisers selected for that purpose. I will here make a remark upon an argument strongly and repeatedly urged on behalf of the claimants. It is this, that there cannot be but one official appraisement of the goods, and that that must be made in the custom-house at which the goods are entered. I think it is not necessary to affirm or deny this doctrine. If the opinions of Messrs. Stewart and Simpson have not the authority of an official appraisement or act, they have nevertheless the weight of the judgment of men accustomed to value goods of this description. and who from their appointments, as well as their experience, may be presumed to have competent knowledge and skill in ascertaining their value. In this light you may consider their evidence and give credit to it accordingly. The evidence of the cost or value of these goods, offered on the part of the United States. is found in these appraisements. But a preliminary objection is made to this evidence, which must be attended to before it is examined. It is said that you are to pronounce upon the fact of an undervaluation, and that you have no evidence of the fact, that is, no proof that the goods are invoiced below their actual cost; and why? Because you have no proof of what the actual cost was; that you have the opinions and valuations of certain persons here in this city, but these do not and cannot prove the fact. You have been asked with great energy, and no small plausibility, Will you pronounce a sentence of fraud upon the claimants? Will you condemn and take away their goods on mere opinions and valuations, when you ought to have proof of the fact that they were undervalued? In reply to these pointed inquiries may you not ask: Why is it that you have not the direct evidence of the fact of actual cost? Why are you obliged to resort to inferior evidence to come at the fact? It is because the claimants who urge this objection upon you, who have in their knowledge and at their command the positive proof of the cost of the goods. have not produced it to you. It is indeed remarkable that, having such proof in their power, they have resorted to, relied up-

on precisely the same evidence they condemn when used by the United States, that is, opinions and valuations obtained here. Is this course of proceeding characterized too strongly, if you should consider the claimants as saying to you: We know what these goods cost; we have the proof in our hands, but we will not produce it; we will compel you to resort to valuations and opinions. and then they say they are not facts; we know that your appraisers will not exactly agree in their valuations, it is not possible they should, and then we will use them to destroy each other, and we will claim to be acquitted of all wrong, because half a dozen men cannot agree upon the amount of the wrong; your witnesses must differ, if they are honest, and in this confusion we will escape. "The absence of testimony," says the late chief justice, "clearly in the power of the claimants, if not supplied by other equivalent testimony, must be fatal." I will say to you that in such circumstances, you are justified in making the strongest presumptions against the party thus withholding the truth from you. This principle, so obviously just and reasonable, is fully recognised in a case reported (Armory v. Delamirie, 1 Strange, 505), well known in our courts. A chimney-sweeper boy found a jewel. and carried it to the shop of the defendant, who was a goldsmith, to know what it was, and delivered it to an apprentice in the shop. He under pretence of weighing it, took out the stones, and said it came to three half pence. The master offered the boy the money, who refused to take it, and insisted upon having the jewel again. They gave him the socket without the stones. The boy brought an action of trover to recover their value. But the value was unknown, and the defendant would not produce the jewel. Whereupon, witnesses of the trade were examined to prove what a jewel of the finest water, to fit the socket, would be worth. The chief justice directed the jury, that unless the defendant did produce the jewel, and show it not to be of the finest water, they should presume the strongest against him, and make the value of the best jewels the measure of their damages, which they did accordingly. The application of this case to that before us is plain; as the claimants will not show the actual cost of these goods, you may presume the strongest against them, and estimate them at the highest appraisement that has been made of them.

You are now to make up your verdict upon such testimony as you have received upon these questions: Were these goods invoiced not at their actual cost? And was this done with a design to evade the duties chargeable upon them? Were the invoices or packages made up with intent, by a false valuation. to defraud the revenue of the United States? For the ascertainment of the cost or value of the goods you have various appraisements, made at different times and places and by dif-

ferent persons. The first at New York, by Mr. Lounsbury, an assistant appraiser, duly appointed and sworn, and by Mr. Tripler, not an appointed appraiser, but the clerk of the appraisers. This appraisement appears to have been made with the greatest possible speed, and the least possible examination. The time occupied was very short; and of the seven hundred and twenty-one pieces, but thirty-two were examined at all. Mr. Lounsbury told you that he has examined one hundred packages a day, which, on his own average of four pieces from each package, would be four hundred pieces examined in a day. You have seen how many hours it took here to examine thirty or forty pieces, and you must judge what sort of an examination Mr. Lounsbury gave to his four hundred, and what reliance you ought to place upon his estimates. You will say whether you will take such a valuation as a safe standard for the whole. I do not intend to speak to you of the examinations and valuations made by Mr. Robinson and other gentlemen of New York, nor of the objections made by the United States to the confidence that should be placed in their opinions and testimony. You have heard their evidence; you have heard the objections, repeated again and again by the counsel, and it is a question of credit of which you are to judge. Of the appraisements made here you are more able to make a just estimate. The witnesses are your fellow-citizens, well known to you, and individually entitled to your respect. Their means of information will, then, be the particular object for your consideration, on the one side and the other. You have for the United States, Messrs. Stewart, Simpson, Siter, Lewis, Churchman, Kennard, Tingly; and for the claimants, Burk, Bernard, Williamson, Newlin, Richardson, Maybury, and some from New York. Your attention should be more directed to the knowledge, the experience, the skill, in judging of the value of cloths, than to the number. One competent witness would outweigh many incompetent ones; but where competency is equal, numbers will preponderate. It is not like evidence of a fact, where the honesty of the witness gives him credit; it is evidence of opinion; of judgment, where the honesty of the witness will not sustain him, unless he has the knowledge and skill to give confidence to his opinion. As to the variance between the valuations made here in court, and those previously made by the same persons at the custom-house, you will remember that Mr. Siter, Mr. Lewis (I think), and Mr. Churchman declared that they could not pretend to form as satisfactory an opinion here as that made at the custom-house; that they would themselves have but little confidence in it, and, in case of a difference, should adhere to the appraisement at the custom-house. With these explanations and qualifications, you will enter upon the examination of all the appraisements, and come to the conclusion you shall conscientiously believe to be

just and true. It is, I think, a very clear proposition, that a valuation made by four or five judicious persons all meaning to do right, who shall compare their separate opinions, hear each other's reasons and agree upon a result, is more to be relied upon as coming at the true value, than the judgment of any one of them, or of any individual. This was done by the appraisers on the part of the prosecution. It is thus that juries make up their verdicts. When they retire to their room, there is generally a variety of opinions, but on comparing their opinions, and hearing each other's reasons, they come to a result in which they all agree, and which is more to be depended upon than any of the separate opinions.

Supposing that you shall find that these goods are undervalued in the invoices, how are you to decide upon the fraudulent intent or design? In doing this you will be influenced by the extent of the undervaluation. Is it enough to have been a temptation to fraud; could it on a large business afford a great profit? Does it run generally through all the invoices, or is it only an occasional undervaluation, that might have happened by accident, by mistake, without any design? These and other considerations will suggest themselves to you on this question of intent. But you will not overlook the conduct of the parties at the time of the seizure. Was it that of upright men in the lawful pursuit of their lawful business? I will not enlarge upon this part of the case. You have heard much of it, and I doubt not will judge of it rightfully; neither refusing it its fair and reasonable influences, not pressing it to an unjust extremity. On this question of fraudulent intention, you cannot put aside the circumstance so often mentioned, and which indeed meets the claimants and frowns upon them at every turn of their case, in every path by which they would escape, their declining or omitting to show the actual cost of these goods, their orders for the importation, their correspondence with the persons in England from whom they were bought, in short every document relating to the purchase, which had a tendency to show the truth and honesty of the transaction.

Finally: As to the first and second counts, I have told you that I think they have not been sustained by the evidence, and that on them your verdict should be for the claimants. The third count. If you shall be of opinion that these goods were found concealed, as charged, and that the duties on them had not been paid or secured, by which you are to understand the whole amount of duties legally chargeable upon them according to their actual cost and value; in that case the goods are forfeited, and the verdict should be for the United States. The fourth and tenth counts are founded on the sixty-sixth section of the act of 1799, which not being repealed, the verdict on these counts should go for the United States, provided that on the evidence you shall

believe that the goods were entered in the office of the collector of New York. and were not invoiced according to the actual cost thereof at the place of exportation, with design to evade the duties thereupon, or any part thereof. The sixth count is founded on the fourth section of the act of 1830, as are also the eighth and eleventh counts. If, on the evidence, you shall believe that the invoices were made up with intent. by a false valuation or extension, to evade or defraud the revenue, your verdict on these counts should be for the United States. The fifth count charges that each and every of the packages, and each and every of the invoices, were made up with intent, by a false valuation, to defraud the revenue, and if you shall so find them, the verdict should be for the United States. The ninth and thirteenth counts are founded on the fourteenth section of the act of 1832. If, on the evidence, you shall believe that the packages were made up with intent to evade or defraud the revenue, your verdict should be for the United States. The seventh and twelfth counts contain a similar charge under the fourth section of the act of 1830, it being laid in these counts that the packages were made up with intent, by a false valuation, to evade and defraud the revenue.

You will observe that many of the counts are substantially the same, varying only in form, or the manner of laying the offence. With the exception of the count for concealment, they may be resolved into these general charges: That the goods were not invoiced according to their actual cost, with a design to evade the duties; that the packages were made up with intent. by a false valuation, to defraud the revenue; that the invoices were made up with that intent; that the packages were made up with intent to evade or defraud the revenue.

This interesting cause will now be committed to you. Seldom has any jury had submitted to them one of equal importance. If, as you have heard, there has been a combination anywhere to defraud your revenue, and depress the honest business and industry of your fellow-citizens. you will be happy to be instrumental in punishing the offenders and breaking it up. On the other hand. if the claimants have had no lot or part in any such combination or practices, it will give you equal pleasure to say so by your verdict.

Verdict for the claimants on the first two counts of the information. and for the United States on the eleven remaining counts.

On the 8th May, 1840, a motion was made, on behalf of the claimants, for a new trial; which was refused on the 1st June. On the 22d April. 1841. a writ of error was taken to the circuit court of the United States for the Third circuit. and on the 25th November of the same year the judgment of the district court was affirmed with costs. [Case unreported.] On the same day a writ of error was taken to the supreme court of the United States, and in January term. 1845, the judgment of the circuit court was affirmed. See 3 How. [44 U. S.] 197.